James F. JORDAN et al., Plaintiffs,

v.

Floyd E. ARNOLD, Warden, U. S. Penitentiary, Lewisburg, Pennsylvania, Defendant.

Civ. No. 75–1334.

United States District Court, M. D. Pennsylvania.

April 30, 1979.
As Amended Aug. 15, 1979.

John M. Humphrey, Williamsport, Pa., for plaintiffs.

Joseph Cimini, Asst. U. S. Atty., Lewisburg, Pa., for defendant.

## OPINION

MUIR, District Judge.

This action was originally filed on October 30, 1975 by members of a class of all inmates subject to being placed in cells on the first floor of the Special Housing Unit (hereafter SHU) at the United States Penitentiary at Lewisburg, Pennsylvania. That action, after trial, resulted in an injunctive order dated March 25, 1976 directed to the Warden of the Penitentiary. On November 17, 1978, a motion was filed seeking an order holding Warden Charles E. Fenton in contempt for alleged violations of the order of March 25, 1976. A hearing was held on the motion from March 6, 1979 until March 29, 1979. The following are the Court's findings of fact, discussion, and conclusions of law.

### I. Findings of Fact.

1. Under date of March 1, 1976, this Court filed a written opinion in the above-captioned case based upon findings and conclusions drawn from a trial held during January, 1976. (Undisputed)

2. On March 25, 1976, after seeking proposals from counsel, this Court entered an appropriate Order based upon such findings and conclusions.

3. The first paragraph of the Order of March 25, 1976 provides: "Defendant shall maintain the ventilation system on the first floor of the Lewisburg Penitentiary Special Housing Unit so that it provides an average minimum of nine air changes per hour, per cell." (U)

4. The second paragraph of the Order of March 25, 1976, provides: "Defendant shall provide for an annual inspection of the ventilation system on the first floor of the Special Housing Unit by qualified ventilation personnel." (U)

5. The third paragraph of the Order of March 25, 1976, provides: "Defendant shall maintain the first floor section of the Spe-

cial Housing Unit in accordance with the Bureau of Prison Policy Statement 7400.5D, July 7, 1975, on Inmate Discipline, or any succeeding policy statements which apply." (U)

6. The fourth paragraph of the Order of March 25, 1976, provides: "Each inmate confined in Disciplinary Segregation shall be afforded the opportunity to shower at least two times per week and shall be permitted no less than two hours of exercise per week. Both of these requirements may be dispensed with if compelling security or safety reasons dictate otherwise and such exceptions are documented. Exercise is to be provided in two one-hour periods, provided, however, that if the circumstances so require, exercise periods may be reduced to one-half hour each so long as the two-hour minimum per week is maintained. Shower periods and exercise periods shall be provided at different times." (U)

7. The fifth paragraph of the Order of March 25, 1976, provides: "Defendant shall follow Bureau of Prisons Policy Statement 7400.5D, July 7, 1975, on Inmate Discipline, or any succeeding policy statements which apply, with regard to placement of individuals in disciplinary segregation." (U)

8. The sixth paragraph of the Order of March 25, 1976, provides: "Defendant shall continue to maintain in cells numbered 101, 102, 103, and 114 on the first floor of the Special Housing Unit sinks capable of control from within the cell, commodes capable of control from within the cell but supplemented by commode override control from outside the cell. The Defendant shall continue to maintain the windows on the first floor of the Special Housing Unit unpainted. The Defendant shall provide lighting in each cell with bulbs totaling not less than 140 watts during reasonable hours." (U)

9. An extended period of inmate violence led to a Board of Inquiry into Lewisburg Penitentiary operations in 1976.

10. The Board of Inquiry recommended a number of changes at the Lewisburg institution.

11. Defendant Charles E. Fenton was appointed Warden of the United States Penitentiary, Lewisburg, Pennsylvania, and assumed the duties of Warden of the United States Penitentiary, Lewisburg, Pennsylvania, on or about September 1, 1976.

12. Prior to his assignment to the Lewisburg institution, Warden Fenton was Warden of the United States Penitentiary at Marion, Illinois. (U)

13. The Marion Penitentiary has been the one maximum penal institution in the Federal Prison System. (U)

14. Previous to his assignment to the Marion Penitentiary, Defendant Fenton had been Warden of the Federal Correctional Institution at Oxford, Wisconsin. (U)

15. At all times relevant hereto, and in particular, from January 1, 1978 to the present, Defendant Charles E. Fenton has been the Warden at the United States Penitentiary, Lewisburg, Pennsylvania, and as such has had overall responsibility for the management, maintenance, and operation of the institution and control over the staff at the Lewisburg Penitentiary, the inmates incarcerated therein, and in particular, the staff and inmates assigned to the first floor of the Special Housing Unit.

16. At all times relevant hereto, Warden Charles E. Fenton was aware of the provisions of the March 25, 1976 Order entered in the above captioned matter, having read said Order in 1976.

17. This Court amended the Order of March 25, 1976 by inserting a Background to that Order on March 14, 1979. (Order filed March 14, 1979; D–43) (U).

18. The Special Housing Unit at the Lewisburg Penitentiary is divided into three floors. (U)

19. The part of the Lewisburg Penitentiary now referred to as the "Special Housing Unit" originally was designed and built with one level of segregation cells, that level being the bottom floor.

20. Expanded need for segregation facilities led to the upper two floors, which originally were designed and built for conventional housing, to be used as segregation

cells after modifications were made in the upper two floors.

21. The third floor of the Special Housing Unit is normally used to house inmates assigned to Administrative Detention, while the second floor of the Special Housing Unit is used to house inmates who are holdovers, as well as those assigned to Administrative Detention. (U)

22. The second and third floors also have been used to house inmates in disciplinary segregation status, as well as prisoners having acute mental problems, marshal's prisoners, and protection cases, among others.

23. The first floor, or "basement" of the Special Housing Unit, consists of 14 single cells, and is normally used to house inmates assigned to Disciplinary Segregation. (U)

24. The bottom floor of the Special Housing Unit also has been used for other prisoners who have high security priority, e. g., a highly assaultive prisoner in transit to the Control Unit at the United States Penitentiary, Marion, Illinois. (U)

25. The bottom floor occasionally has been used to provide single-cell housing for other inmates when that housing is not available elsewhere in the Special Housing Unit.

26. The national Federal Bureau of Prisons Policy Statement on the subject of Inmate Discipline, numbered 7400.5D, and dated July 7, 1975, defines "administrative detention" and "disciplinary segregation" in language subsequently utilized in the Local Policy Statement, No. NE 7400.5D.

27. Policy Statement NE 7400.5D, dated 9/9/75, on Inmate Discipline has been the applicable policy statement from January 1, 1978 to the present concerning conditions in Disciplinary Segregation and requirements for placement of individuals in Disciplinary Segregation. (U)

28. According to Policy Statement NE 7400.5D, Inmate Discipline, Administrative Detention is the status of confinement which results in a loss of some privileges which the inmate would have if assigned to the general population. (U)

29. According to Policy Statement NE 7400.5D, Inmate Discipline, Disciplinary Segregation includes the status of confinement of an inmate housed in an individual cell either by himself or with other inmates, separated from the general population, as a result of a hearing before the Institution Discipline Committee (IDC) in which the inmate has been found to have committed a prohibited act.

30. The 14 cells on the first floor of the SHU are separated from the other areas of the SHU located in the basement by glass doors.

31. Within the area occupied by the 14 cells on the first floor of the SHU any cells which might be used to house prisoners in Administrative Detention status are not physically separated as a group from the remainder of the cells.

32. Most of the inmates who have been housed on the first floor of the SHU have been in Disciplinary Segregation or temporary Disciplinary Segregation status, and as such are entitled to significantly fewer privileges than those inmates in Administrative Detention.

33. Cells 101, 102, 103 and 114 were used solely as disciplinary segregation cells for some time during Warden Floyd E. Arnold's tenure at the Lewisburg Penitentiary.

34. The remaining cells on the first floor were used for either disciplinary segregation or administrative detention purposes.

35. Some time after arriving at the Lewisburg Penitentiary, as Warden, the Defendant, Charles E. Fenton, changed the institution's procedures so that all cells on the first floor could be used for disciplinary segregation or administrative detention purposes.

36. Those inmates who are housed on the first floor of the Special Housing Unit who are not in Disciplinary Segregation or temporary Disciplinary Segregation status are considered by the penitentiary staff to be in Administrative Detention status.

37. Each of the doors to cells on the first floor of the Special Housing Unit has a

small opening called a wicket which may be closed from outside of the cells. (U)

38. When Defendant came to the Lewisburg Penitentiary cell door wickets were being used to seclude inmates from others who were working in cell corridors. (U)

39. During an inspection shortly after his arrival at Lewisburg, several inmates, and one in particular, attempted to intimidate Warden Fenton by threats and insults, at which the Warden directed that the inmates' cell door wickets be raised to a closed position.

40. Defendant directed that the cell door wicket be closed for any prisoner who attempted to intimidate any staff member in the performance of his duties. (U)

41. Authority to close cell door wickets earlier had been delegated to the Supervisor of the Special Housing Unit, but, now orders to close wickets either must be cleared by the Warden in advance or presented for his review as soon as practicable. (U)

42. More recently transparent wickets have been installed on a number of cell doors on the first floor of the Special Housing Unit. (U)

43. As Warden, Defendant Fenton averages several visits weekly to the first floor of the Special Housing Unit. (U)

44. During his visits to the first floor of the Special Housing Unit, conditions of sanitation, food, temperature, discipline, and other operational details are observed. (U)

45. During his visits to all levels of the Special Housing Unit, Defendant converses with prisoners indicating a desire to do so, usually including several on the first floor.

46. When in the course of conversations with inmates, he has occasion to hear various complaints which concern operational matters on which logs are maintained, Defendant Fenton often personally checks the logs, if available, or directs that others do so.

A. Ventilation.

47. Shortly after his arrival at Lewisburg, Defendant discussed compliance as to paragraphs 1 and 2 of the March 25, 1976, Order with individuals employed in the Penitentiary's Mechanical Services Department. (U)

48. Defendant was advised that, prior to his arrival, the first floor ventilation system had been made operational to comply with the first paragraph of the March 25, 1976 Order. (U)

49. Defendant further was advised that the Penitentiary's Mechanical Services Department was complying with the second paragraph of the March 25, 1976 Order on an ongoing basis.

50. Defendant Fenton received a letter dated April 5, 1978 from Plaintiffs' counsel concerning ventilation on the first floor of the Special Housing Unit.

51. Because counsel's letter appeared to request more documentation than existed, Defendant directed that additional testing and documentation be obtained.

52. Defendant further directed that periodically the Penitentiary's Mechanical Services Department should conduct ventilation tests and document the same.

53. Mr. Franklin E. Cook, pipefitter, conducted inspections of the ventilation system on the first floor of the SHU and performed maintenance during 1977 on the following dates: January 11 and 25; February 4 and 25; March 4 and 27; May 5, 19, and 31; June 30; July 14; August 11, 19, and 26; September 6, 16, and 30; October 14, 18 (unit cleaned), and 28; November 15, and 25; and December 20. (F. E. Cook).

54. Mr. Franklin E. Cook, pipefitter, conducted inspections of the ventilation system on the first floor of the SHU and performed maintenance during 1978 on the following dates: January 11; February 9 and 24; March 21; April 7, 11 and 24; May 5; June 1, 9 and 14 (unit cleaned); June 21; July 6 and 19. (F. E. Cook)

55. The first time that air flow tests were conducted in the cells on the first floor of the SHU after April 1, 1976 was during the week of April 10, 1978, several days after the attorney for the Plaintiff class

wrote Warden Charles E. Fenton requesting documentation of compliance with paragraph 2 of the Court's March 25, 1976 Order requiring annual inspections of the ventilation systems. (P–97, P–98).

56. Mr. James Swartz, Engineering Technician, Mechanical Engineer at the Penitentiary, holds a Bachelor of Science degree from Bucknell University. (U)

57. Mr. Swartz ran tests to measure the minimum air change per cell, per hour, in cells on the first floor of the SHU on April 14, 1978. (Swartz)

58. Mr. Swartz conducted an air change test on December 15, 1978, and this test revealed an average minimum number of 9.01 air changes per cell per hour, *including recirculated air*, on the first floor of the SHU. (Swartz)

59. Mr. Swartz is not a "qualified ventilation" person.

60. Mr. David Bachman, a heating and ventilation contractor, conducted air change tests on the cells on the first floor of the SHU on February 8, 1979, and this test revealed an average minimum air change per cell, per hour of 4.5. (Bachman) (U)

61. Based upon the ventilation tests of David Bachman on February 8, 1979, it was determined that the number of air changes per hour for each of the cells on the first floor of the SHU were as follows:

Cell 101—5.2; Cell 102—2.3; Cell 103—4.-9; Cell 104—5.9; Cell 105—4.25; Cell 106—4.75; Cell 107—4.0; Cell 108—3.2; Cell 109 —3.7; Cell 110—4.0; Cell 111—5.1; Cell 112—5.2; Cell 113—7.3; Cell 114—8.7. (U)

62. According to Mr. Bachman, the ventilation system on the first floor of the SHU on February 8, 1979 provided approximately one half of the ventilation which it was providing on January 20, 1976.

63. The exhaust fan from the ventilation system on the first floor of the SHU is sufficient to provide the 9.0 air changes per hour per cell as provided for in the Court's Order.

64. When Mr. Bachman consulted with Plaintiffs for the purpose of the original action, he based his recommendation as to the required number of air changes in the SHU in part upon those recommended for public restrooms.

65. The ventilation standard for a prison cell block propounded by the American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE) is a minimum of 7 cubic feet per minute (cfm) per person, and a recommended level of 10 to 15 cfm. (Swartz, Bachman) (U)

66. The ventilation standard for a prison cell block propounded by the American Correctional Association (ACA) is a minimum of 10 cfm per person. (Swartz) (U)

67. The air flow in cells on the first floor of the SHU averages 30 cfm per cell. (Swartz, P–281) (U)

### B. Showers and Exercise.

68. Inmates confined in Disciplinary Segregation were routinely afforded the opportunity to shower at least two times per week except when compelling security or safety concerns dictated otherwise.

69. When compelling security or safety concerns prevented correctional officials from giving Disciplinary Segregation inmates the requisite two showers per week, the omission was adequately documented.

70. Inmates confined in Disciplinary Segregation were afforded the opportunity to partake of at least two hours of exercise per week in two one-hour periods or their equivalent except when compelling security or safety concerns required otherwise.

71. When less than two hours of exercise per week was provided, the omission was properly documented.

### C. Placements in Disciplinary Segregation.

72. During the discovery phase of the civil contempt proceedings, Plaintiffs requested various information and documents concerning inmates known to have been place on the first floor of the SHU without a prior hearing. In addition, Plaintiffs requested the names of, and information and documents concerning other inmates who

have been placed on the first floor of the SHU. (U)

73. The penitentiary kept no central listing or file of any type which would record those inmates who had been placed on the first floor of the SHU. However, the Special Housing Unit Log Book prior to September 19, 1978, routinely listed the number of the cell in the SHU to which a person was assigned from general population.

74. The SHU Log Books for the period January 6, 1978 through September 18, 1978, indicate that during this period 1053 inmates were moved from general population to the SHU. Of these 1053 entries, 957 contain the number of the SHU cell in which the inmate was initially placed. The remaining 96 entries do not contain such a cell designation. (Stipulation) (U)

75. The SHU Log Books for the period of January 6, 1978 through September 18, 1978, indicate that during this period 2062 inmates were admitted to the SHU from areas other than the general population of the United States Penitentiary, Lewisburg. Of these 2062 entries, 720 contain the number of the cell in the SHU in which the inmate was initially placed. The remaining 1342 entries do not contain such a cell designation. (Stipulation) (U)

76. Since the only document resembling a centralized listing of inmates who have been placed on the first floor, i. e., the Special Housing Unit Log Book ceased listing such placements as of September 19, 1978, Plaintiffs were unable to prove all other possible violations of the March 25, 1976 Order which might have existed following September 18, 1978.

77. On February 11, 1978, inmate Allen Best was received at the Lewisburg Penitentiary from another institution and was immediately placed in a cell on the first floor of the SHU without first having received a hearing before the IDC, and at a time when no incident report had been filed against him for any alleged misconduct.

78. Best is an extremely assaultive offender; he has a history of impulsivity and frequent misbehavior.

79. Upon commitment to Lewisburg, inmate Best refused to submit to fingerprinting and prints were taken only after he was forceably restrained.

80. While in a Connecticut institution for robbery Best had been involved in serious assaults. Because he was a serious management problem he was transferred to the Federal System.

81. At approximately 8:40 P.M., on February 13, 1978, while confined on the first floor of the SHU in Administrative Detention status, Best became hostile and insolent toward three officers by yelling in a loud voice and spitting in the face of one of the officers. (P–1)

82. Best while remaining on the first floor of the SHU was not provided a hearing before the Institution Discipline Committee (IDC) until February 17, 1978. This hearing was held on charges that he was insolent towards a staff member on February 13, 1978 while on the first floor of the SHU. (Exhibits P–1, P–2).

83. Best was found by the IDC to have committed the prohibited act charged.

84. The IDC withheld statutory good time (SGT) for the month of February, placed Best in Disciplinary Segregation, and scheduled him for review on February 24, 1978. (P–1, P–2)

85. On the afternoon of August 13, 1978, inmate Robert Chappelle had to be moved from the pitcher's mound of Softball Field # 2 in the main recreation yard where he was sitting with an aluminum baseball bat across his legs preventing other inmates from using the field. (P–6, D–60, Mr. Thomas)

86. Inmate Chappelle was charged with disrupting activities in the yard and giving a false statement to a staff member, which charges resulted in an Incident Report. (P–6). (U)

87. As a result of this Incident Report, and prior to any hearing before the IDC, inmate Chappelle was moved to the first floor of the SHU. (D–60, D–61, Mr. Thomas)

88. Robert Chappelle received a hearing before the IDC on August 16, 1978.

89. The IDC found that Chappelle had committed the prohibited acts of conduct which disrupts or interferes with the orderly running of the institution and providing a false statement to a staff member.

90. The IDC placed Chappelle in Disciplinary Segregation status, referred him for a mental health evaluation and recommended a disciplinary transfer. (P–8, Mr. Thomas)

91. On August 19, 1978, during his exercise period in the SHU gym, Chappelle refused to leave the area and be escorted to his assigned cell. (D–62)

92. On August 28, 1978, inmate Chappelle and three other inmates created a serious disruption in the SHU by banging on their cell doors and shouting at staff members. (P–193, Mr. Mort)

93. Although each of the four inmates was given a direct order to stop his disruptive conduct, each refused to stop and instead attempted to encourage others to join in their demonstration. (P–193, Mr. Mort)

94. Although he submitted to having restraints placed upon him, inmate Chappelle made hostile and insolent remarks, including profanity, wherein he was heard to state "Yeah, you can place the cuffs on me any day because I know by your fucking rules you must take them off tomorrow at the same time." (P–193, Mr. Mort)

95. Inmate Chappelle participated in a major disturbance in the SHU on December 16, 1978. (D–53, Humme)

96. On August 27, 1978, while assigned to quarters C–X, general population, inmate Charles Howard, Jr., was charged with refusing to obey an order of a staff member, which charge resulted in an Incident Report. (P–9) (U)

97. As a result of this Incident Report, inmate Howard was immediately placed on the first floor of the SHU, prior to receiving an IDC hearing. (P–11, P–279) (U)

98. Inmate Howard was placed in cell 110 on the first floor of the SHU at approximately 5:20 P.M. by Lt. John Klopf. (P–9, P–11)

99. Inmate Howard received a hearing before the IDC on this charge on August 30, 1978. (P–10)

100. The IDC found that Howard had committed the prohibited act of refusing to obey an order of a staff member; the IDC placed him in Disciplinary Segregation status, withheld SGT for the month of August, and scheduled him for review on September 6, 1978. (P–10) (U)

101. On August 7, 1978, a disturbance erupted on the "red top" area outside the institution's inmate dining rooms when inmate McCollum who had just learned that his cell had been "burned out" by other inmates broke away from correctional staff escorting him to the correctional supervisor's office in the east corridor. (Hudson, Mort)

102. Inmate McCollum proceeded to assault a number of prisoners in the inmate dining room. (Hudson, Mort)

103. A large group of inmates gathered quickly on the "red top" area and refused to leave after being ordered to do so by staff members.

104. The correctional staff almost lost control of the situation on August 7, 1978. The emergency siren was sounded and additional employees were summoned to assist in the quelling of the disturbance. (Hudson, Mort)

105. On August 7, 1978, while assigned to general population, inmate Frederic Cox was taken from population directly to Cell 107 on the first floor of the SHU, without a prior IDC hearing, pending investigation of possible participation in a group demonstration. (P–21)

106. Inmate Cox remained on the first floor of the SHU until some time between August 22 and August 28, 1978, during which period he was not given an Incident Report, was not given an IDC hearing and was not found guilty of any infraction by the IDC. (P–22, P–23, P–24)

107. As a result of the alleged investigation involving Cox, inmates Ronald Cooley, Larry Peterson, and Alexander Patton, were likewise moved from general popula-

tion to the first floor of the SHU without having received an Incident Report or a hearing before the IDC (P–279, P–13, P–225, P–226, P–202, P–205).

108. The reason for placing inmates Cooley, Peterson and Patton in the SHU was for investigation of a large group disturbance in general population, the penitentiary officials apparently having received information that these inmates were encouraging other inmates to become disruptive. (U)

109. Although encouraging others to riot or engage in disruptive activities is a rule infraction at the penitentiary, none of the four inmates was ever charged with any rule infraction and none ever received any incident report concerning the August 7, 1978 incident.

110. Inmates Cooley and Peterson remained on the first floor of the SHU from August 7, 1978 until August 12, 1978, during which time they received no hearing before the IDC. (U)

111. Inmate Alexander Patton was kept on the first floor of the SHU from August 7, 1978 until sometime during the week of August 22, 1978, during which time he received no IDC hearing.

112. On December 7, 1978, inmate Ronald Cooley received an Incident Report charging him with threatening another with bodily harm, insolence toward a staff member, and conduct which disrupts. (D–51, Humme) (U)

113. On December 13, 1978, inmate Cooley received a hearing before the IDC on the December 7 Incident Report; at this hearing he was found to have committed the prohibited acts charged and the IDC ordered him placed in Disciplinary Segregation. (D–52) (U)

114. Although housed on the third floor of the SHU on December 16, 1978, inmate Cooley was in Disciplinary Segregation status as a consequence of IDC action on December 13, 1978. (D–52) (U)

115. On December 16, 1978, a disturbance broke out on the second and third floors of the SHU. During said disturbance, various inmates, while housed in locked cells, yelled and kicked on their doors for several hours. In addition, several unknown inmates threw burning pieces of cloth into the hallways or out of the second and third floor windows.

116. During the December 16, 1978 disturbance, a riot squad of correctional officers was assembled under the direction of Warden Fenton and a number of inmates were removed from the second and third floors and placed in temporary Disciplinary Segregation status on the first floor of the SHU.

117. During this major disturbance in the SHU on December 16, 1978, inmate Cooley while confined on the third floor of the SHU became disruptive, started banging on his door, and demanded to be fed; other inmates on the third floor joined Cooley's disruptive activities and started banging on their doors and shouting. (P–285) (U)

118. Inmate Cooley was charged with encouraging others to riot and conduct which disrupts, which charges resulted in an Incident Report being filed against him. (P–14)

119. The charges against inmate Cooley on December 16, 1978, were referred to the Federal Bureau of Investigation which officially declined prosecution as of December 26, 1978. (P–14)

120. During the period following the December 16, 1978, incident an emergency situation existed in the SHU. (Hudson's, Humme's and Wicka's notations on reverse side of BP–IS–111's; Testimony of Hudson, Wicka, Mort, Humme, Fenton, Sinsheimer)

121. Inmate Cooley did not receive a hearing on the December 16, 1978 charge until January 3, 1979, during which time he was held continuously on the first floor of the SHU.

122. On December 16, 1978, as a result of the disturbances on the second and third floors, the following inmates, in addition to inmate Cooley, were moved to the first floor of the SHU from either the second or third floor of the SHU without a prior

hearing and placed in disciplinary segregation status: G. McCollum, A. Patton, R. Warren, R. Kesting, R. Chappelle, F. Knight, R. Winston, D. DeSantos, R. McCue, J. Massaro, H. Williams, C. Marts, Buerrero, E., Totaro, S., and P. VanScoy. (D–45)

123. Approximately six of the above inmates were transferred from Lewisburg on December 26, 1978, after having been given a December 22, 1978 IDC hearing on the Incident Reports filed against them as a result of the December 16, 1978 incident. Between December 16, 1978 and their transfer, these inmates remained on the first floor of the SHU. (U)

124. Of the remaining inmates who were placed in temporary Disciplinary Segregation as a result of the December 16, 1978 incidents, none received a hearing before the IDC prior to January 3, 1979, even though they remained continuously on the first floor of the SHU. (U)

125. All sixteen inmates placed on the first floor of the SHU on December 16, 1978, were issued clothing on that date, except inmate Chappelle and H. Williams who refused to accept clothing. (Humme, Thomas)

126. Restraints were removed from all sixteen inmates on the first floor of the SHU on December 16, 1978, at approximately 11:30 P.M. on that date. (D–45, Thomas) (U)

127. By 11:30 P.M. on December 16, 1978, inmates Chappelle and H. Williams decided to accept clothing and clothing was issued to both. (Thomas) (U)

128. The IDC hearings on charges against seven of the inmates involved in the December 16, 1978 disturbance in the SHU were delayed until December 23, 1978, pending referral and possible investigation by the Federal Bureau of Investigation which declined to investigate on December 22, 1978. (Mr. Mort) (U)

129. On April 16, 1978, Samuel Frustino, an inmate serving a "split sentence" pursuant to 18 U.S.C. § 3651, was transported from the Penitentiary's Farm Camp and placed in Administrative Detention status in a cell on the first floor of the SHU. (P–28, P–29, R. Sinsheimer, Warden Fenton) (U)

130. Inmate Frustino was placed in a single cell on the first floor in Administrative Detention status in order to separate him from long term offenders housed in the SHU. (Sinsheimer, Fenton).

131. Inmate Frustino was released from the SHU on April 18, 1978, following a hearing before the Unit Disciplinary Committee (UDC). (P–28, P–29)

132. On July 31, 1978, while assigned to quarters in general population, inmate John Haley was moved directly to the first floor of the SHU for investigation of sex pressure, exerted by him on another inmate, without first having received a hearing before the IDC. (P–44, P–279, Log Book, D–64)

133. Inmate Haley remained on the first floor of the SHU until sometime during the week of July 31, 1978, and received no IDC hearing during the time that he remained on the first floor.

134. On August 14, 1978, at approximately 7:30 P.M. while assigned to cell 314 on the third floor of the SHU, inmate Gerald Harris was charged with fighting with his cell mate, which charge resulted in an Incident Report. (P–48)

135. As a result of this charge, inmate Harris was immediately moved to the first floor of the SHU and placed in Disciplinary Segregation status without first having received a hearing before the IDC. No memo concerning temporary placement in Disciplinary Segregation was forwarded to the Regional Director. (P–47, P–50)

136. Inmate Harris did not receive an IDC hearing until August 18, 1978, but remained on the first floor of the SHU continuously from August 14, 1978 through the date of the hearing. (P–49, P–47)

137. The IDC found that inmate Harris had committed the prohibited act of fighting with his cell mate and placed him in Disciplinary Segregation. (P–49) (U)

138. Inmate Harris' cell partner, inmate Wellons, No. 40013, was placed in Disciplinary Segregation as a result of the August 14, 1978 incident in which he fought with his cell mate, Harris. (P–50)

139. On August 14, 1978, inmate Wellons was placed immediately in Disciplinary Segregation on the first floor of the SHU without first having received a hearing before the IDC and without any indication that this was a temporary placement in Disciplinary Segregation. (P–50)

140. Also on August 14, 1978, inmate Bias, No. 00652, was removed from Administrative Detention to Disciplinary Segregation on the first floor of the SHU because of an alleged fight, which fight was a separate incident from the incident involving inmates Wellons and Harris. (P–50)

141. On April 1, 1978, while assigned to a cell on the third floor of the SHU, inmates Joseph Hill and William Gladney allegedly refused to permit a third inmate to be admitted to their cell and as a result of this refusal, were immediately moved to the first floor of the SHU and placed in temporary Disciplinary Segregation status without a prior hearing before the IDC. (P–52, P–53)

142. Defendant Fenton by Memo of April 7, 1978, to the Regional Director, documented this temporary placement in Disciplinary Segregation as required by Policy Statement NE–7400.5D. (P–53)

143. Inmate Hill remained in temporary Disciplinary Segregation status until his release from the SHU on April 3, 1978 at 6:00 P.M. An Incident Report was never filed against him on this incident, and he was never given a hearing on the incident before the IDC. (U)

144. On March 8, 1978, inmate Richard Hilleary while assigned to a cell on the third floor of the SHU was moved to the first floor of the SHU without a prior IDC hearing on the alleged grounds that he and other inmates on the third floor of the SHU had been planning a food strike, that this activity caused hostile feelings from other inmates in the SHU, and that there was

therefore a need to separate him from the Administrative Detention (ADDT) general population. (P–55, P–56, P–57, P–58). (U)

145. Inmate Hilleary remained on the first floor of the SHU until March 17, 1978, and during that period no Incident Report was filed against him and he did not receive a hearing before the IDC on any rule infraction during this period. (P–55, P–57, P–58, Sinsheimer).

146. In addition to inmate Hilleary, the following inmates were likewise moved from the third floor of the SHU to the first floor of the SHU on March 8, 1978 as a result of the alleged plans for a food strike, said move occurring without a prior hearing by the IDC: inmates Gerald, Oscar Washington, Ehly, Richard Picariello, and Lawrence Kearney. (P–279) (U)

147. These last named six inmates, upon being placed in cells on the first floor of the SHU, were placed in said cells without clothing, and they did not receive any clothing for several hours.

148. Upon being placed in cells on the first floor, the wickets on the cell doors of these inmates were closed, and remained closed for several days.

149. On August 27, 1978, while assigned to quarters in general population, inmate John C. Hyman was charged with refusing to obey an order, insolence, and interfering with the taking of count, which charges resulted in an Incident Report. (P–60) (U)

150. As a result of these charges, inmate Hyman was immediately moved from general population to a cell on the first floor of the SHU without having received a hearing before the IDC. (P–62, P–279) (U)

151. Inmate Hyman did not receive an IDC hearing on the charge until August 30, 1978. (P–61)

152. On August 30, 1978, the IDC ordered his placement in Disciplinary Segregation. (P–60, P–61, P–62)

153. On October 5, 1978, inmates James Jordan and Isaac Taylor were being escorted to the SHU for investigation, at which time inmates Taylor and Jordan were charged with creating a disturbance in re-

sisting placement in the SHU. (P–70, P–73, P–74, P–75) (U)

154. Both inmates Taylor and Jordan physically resisted and had to be carried to the SHU. (P–74, D–63)

155. The staff initially intended to place both Taylor and Jordan in Administrative Detention status in the SHU for investigation, but it became necessary to place both in temporary Disciplinary Segregation status because of their disruptive conduct enroute to the SHU. (P–74, D–63)

156. The investigation of the October 5, 1978, Incident Report was delayed due to an ongoing investigation and referral of the charges to the Federal Bureau of Investigation. (P–70, Brookmole) (U)

157. As a result of this alleged disturbance, inmates Jordan and Taylor were immediately placed on the first floor of the SHU, in temporary Disciplinary Segregation status, without first having received a hearing before the IDC. (U)

158. Inmates Taylor and Jordan remained on the first floor of the SHU in temporary Disciplinary Segregation status until October 11, 1978. (P–72)

159. Inmates Jordan and Taylor did not receive an IDC hearing on the October 5, 1978 incident until October 18, 1978.

160. By memo from Warden Fenton, the Regional Director was informed of the temporary placement of inmates Jordan and Taylor in Disciplinary Segregation in compliance with the Policy Statement. (P–75, D–63)

161. Inmate Jordan was moved from the first floor to the third floor of the SHU on October 11, 1978. (P–72)

162. Inmate Jordan was seen by the IDC for a seven day review on or about October 11, 1978 at which time the IDC decided to return Jordan to Administrative Detention status pending investigation and review by the UDC on the Incident Report of October 5, 1978. (D–69) (U)

163. Inmate Jordan received an IDC hearing on the October 5, Incident Report on October 18, 1978, at which he was placed in Disciplinary Segregation status. (P–70, P–71) (U)

164. On September 4, 1978, inmates Ronald Kesting and Phillip VanScoy were moved directly from population to the first floor of the SHU for investigation of the killing of inmate Gonzalez without first having received an IDC hearing. (P–279, P–238) (U)

165. Inmates Kesting and VanScoy were placed on the first floor to separate them from another inmate who had provided information against them regarding the killing and who was housed on the second floor of the SHU. (Hudson)

166. Both inmates were kept on the first floor of the SHU through September 8, 1978, when they each received an IDC hearing on charges unrelated to the investigation. (P–81, P–238) (U)

167. On September 8, 1978, following his hearing before the IDC on a September 4 incident Report, inmate Kesting was placed in Disciplinary Segregation status. (P–80, P–81) (U)

168. On September 8, 1978, following his hearing before the IDC on an Incident Report charging him with possession of contraband, inmate VanScoy was placed in Disciplinary Segregation status. (P–238) (U)

169. On October 16, 1978, following hearings before the IDC, inmates Kesting and VanScoy were found to have committed the prohibited act of fatally stabbing inmate Gonzalez and were placed in Disciplinary Segregation. (P–79, P–236)

170. At approximately 10:10 A.M. on November 28, 1978, inmate Kesting assaulted inmates Schlobohm and Fortune while exercising in the SHU gymnasium. (P–85, Brookmole)

171. Inmate Kesting struck inmate Fortune numerous times in the head and continued kicking Fortune when he fell to the floor. (P–85, Brookmole)

172. Inmate Fortune received a multifractured jaw and numerous cuts and abrasions. (P–85, Brookmole)

173. Inmate Kesting then assaulted inmate Schlobohm, striking him in the left eye and also kicking Schlobohm as he fell to the floor. (P–85, Brookmole)

174. Inmate Schlobohm received a bruised and swollen eye and several abrasions. (P–85, Brookmole)

175. As a result of charges relating to these incidents, in November 28, 1978, inmate Kesting was immediately moved to the first floor of the SHU in Disciplinary Segregation status without first having received an IDC hearing. (P–87, P–88, P–89)

176. By Memo dated November 30, 1978, Warden Fenton informed the Regional Director of the temporary placement of inmate Kesting in Disciplinary Segregation in accordance with the Policy Statement NE–7400.5D. (P–89) (U)

177. The investigation of the November 28, 1978, assault on Fortune and Schlobohm by Kesting was delayed because of a referral of the charges to the Federal Bureau of Investigation. (P–85, Brookmole) (U)

178. The Federal Bureau of Investigation declined on December 7, 1978 to go forward with the investigation of the assaults on inmates Fortune and Schlobohm by inmate Kesting. (P–85, Brookmole) (U)

179. Inmate Kesting did not receive an IDC hearing on this charge until December 13, 1978 but nevertheless remained on the first floor of the SHU in temporary Disciplinary Segregation until sometime during the week of December 5, 1978. (P–89, P–90, P–92)

180. At the December 13, 1978, IDC hearing inmate Kesting was found to have committed the prohibited act of assaulting inmates Fortune and Schlobohm and was placed in Disciplinary Segregation. (P–86).

181. On December 16, 1978, during a riotous situation in the Administrative Detention area on the third floor of the SHU inmate Phillip VanScoy refused an order to leave his cell. Force was used and inmate VanScoy was placed in restraints and in Temporary Disciplinary Segregation status on the first floor of the SHU. During the riotous incident on this date inmate Van-

Scoy encouraged others to riot by his assaultive actions. (P–239)

182. By teletype message dated December 18, 1978, Defendant Fenton advised the Regional Director of the temporary placement of inmate VanScoy in Disciplinary Segregation in compliance with Policy Statement 7400.5D. (D–45) (U)

183. Investigation of the Incident Report issued to inmate VanScoy regarding the December 16, 1978 disruption was delayed until December 27, 1978, because of the magnitude of the incident, the number of persons involved in the incident, and the referral to the Federal Bureau of Investigation which officially declined to investigate on or about December 26, 1978. (P–239)

184. On January 4, 1979, inmate VanScoy received a hearing before the IDC and was found to have committed the prohibited acts charged and was continued in Disciplinary Segregation status on the first floor of the SHU. (P–240)

185. On December 16, 1978, an object appearing to be a lock pick was found in inmate VanScoy's property. (D–38)

186. An Incident Report was written, the matter was investigated following a declination of investigation by the FBI on December 26, 1978, and an IDC hearing was held on this charge on January 4, 1979, at which time the IDC found that inmate VanScoy had committed the prohibited act charged and continued him in Disciplinary Segregation status on the first floor of the SHU. (D–38, D–40)

187. On January 1, 1979, inmate VanScoy threw his tray of food out of his cell hitting Correctional Supervisor Wicka and Food Service Foreman Elliott. (U)

188. An incident report was written, an investigation was conducted, and an IDC hearing was held on January 4, 1979. (U)

189. Inmate VanScoy admitted to the IDC that he hit Mr. Wicka with his food tray; the IDC found him to have committed the prohibited acts of insolence toward a staff member and conduct which disrupts; and continued him in Disciplinary Segregation status. (D–39, D–41) (U)

190. On April 26, 1978, while assigned to the third floor of the SHU and while in the visiting room, inmate Frank Knight was charged with an assault upon a staff member, which charge resulted in an Incident Report. (P–102) (U)

191. On August 22, 1978, while assigned to a cell on the second floor of the SHU in Administrative Detention status, inmate Knight was charged with insolence toward a staff member, which charge resulted in an Incident Report. (P–116) (U)

192. On August 23, 1978, while assigned to a cell on the second floor of the SHU in Administrative Detention status, inmate Knight was charged with refusing to obey an order of a staff member, insolence toward a staff member, and conduct which disrupts the orderly running of the institution, which charge resulted in an Incident Report. (P–118, P–119) (U)

193. On August 27, 1978, while assigned to a cell on the second floor of the SHU in Administrative Detention status, inmate Knight was charged with threatening to kill an officer, which charge resulted in an Incident Report. (P–122)

194. As a result of this charge, inmate Knight was moved to a cell on the first floor of the SHU without first having received an IDC hearing. (P–124, P–126)

195. On August 28, 1978, inmate Knight received a hearing before the IDC on the incident reports dated August 22, 1978, and August 23, 1978. At this hearing which inmate Knight refused to attend, the IDC found him to have committed the prohibited acts as charged.

196. On August 28, 1978, Defendant Fenton sent a memorandum to the Regional Director advising him of the placement of inmate Knight in temporary Disciplinary Segregation status on August 27, 1978, in accordance with Policy Statement 7400.5D. (D–66) (U)

197. On August 28, 1978, inmate Knight and three other inmates created a serious disruption in the SHU by banging on their cell doors and shouting at staff members. (P–193, Mr. Mort)

198. Although each inmate was given a direct order to stop, each refused to stop his disruptive conduct, attempting instead to encourage others to join in their demonstration. (P–193, Mr. Mort)

199. When approached and given a direct order to place his hands on his cell door slot in order that handcuffs be applied, inmate Knight replied: "If you motherfuckers want me you will have to come in and get me and be prepared to fight because I am going to get my licks in." (P–193, Mr. Mort)

200. Inmate Knight physically resisted correctional officers on August 28, 1978, and struck a blow with his fist to the forehead of Correctional Supervisor Kerstetter before the inmate finally was controlled. (P–193, Mr. Mort)

201. On January 30, 1979, inmate Knight threw urine on Mr. K. Kauffman, caseworker, while in the SHU. (Knight) (U)

202. On March 7, 1979, at 7:05 A.M. while housed on the second floor of the SHU, inmate Frank Knight was charged with yelling abusive language at a prison employee and threatening to throw a cup of urine on him, which charge resulted in an Incident Report. (P–293) (U)

203. At 7:45 A.M. inmate Knight was involved in another incident which resulted in charges of refusing an order from a staff member and insolence. Inmate Knight was later taken to this Court for the purpose of testifying in this action. Upon his return to the institution at approximately 5:00 P.M., he was placed on the first floor of the SHU in temporary Disciplinary Segregation status without first having received a hearing before the IDC. (D–44)

204. On March 8, 1979, Warden Fenton sent a memorandum to the Regional Director advising him of the placement of Frank Knight in temporary Disciplinary Segregation on March 7, 1979, in accordance with Policy Statement 7400.5D. (D–44) (U)

205. On March 9, 1979, inmate Frank Knight received a hearing before the IDC at which time he was found to have com-

mitted the prohibited acts charged and the IDC ordered him retained in Disciplinary Segregation status. (Knight) (U)

206. At approximately 8:30 P.M. on September 4, 1978, inmate Ronald Little was observed attempting to exit D Dining Room with an unidentified female guest. (P–147, P–148) (U)

207. When inmate Little was told that he could not escort the female guest to the lavatory, he shouted at the correctional officer and attracted the attention of the large number who were attending a religious banquet in the inmate dining room. (P–147, P–148) (U)

208. Little was charged with insolence and conduct which disrupts, which charge resulted in an Incident Report. (P–147)

209. As a result of this charge, inmate Little was immediately placed on the first floor of the SHU on September 4, 1978, without first having received a hearing before the IDC, which hearing was eventually held on September 8, 1978. (P–279, P–149)

210. A BP–IS–116 form dated September 15, 1978, reflects that inmate Little's placement in the SHU on September 4, 1978, was to Administrative Detention. (D–67) (U)

211. On September 8, 1978, at 12:15 P.M. inmate Little received his hearing before the IDC on the September 4, 1978, Incident Report; the IDC found that he committed the acts charged per the inmate's own admission, and placed him in Disciplinary Segregation. (P–149) (U)

212. During the week of August 8, 1978, inmate Larry Logan, while assigned to a cell on the second floor of the SHU, was moved to the first floor of the SHU without a charge and without a prior Incident Report for allegedly yelling at an officer from his second floor window. (P–154)

213. No charge was lodged against Logan for this incident and he was not given an IDC hearing. No memorandum concerning the move was submitted to the Regional Director.

214. Inmate Logan was physically placed on the first floor as he claimed he was a "single." (P–154) (U)

215. Inmate Logan denied yelling at the officer and stated that he would commit suicide unless he was moved out. (P–154) (U)

216. After being moved to the first floor of the SHU, inmate Logan banged continually on his door and yelled until at least midnight, disturbing the other inmates on the first floor. (P–154)

217. Sometime between February 28, and March 6, 1978, Lieutenant Wicka directed that the wicket on Logan's cell door be closed until March 14, 1978, because of Logan's loud, disruptive yelling. (P–152)

218. On April 14, 1978, inmate Richard McCue received an Incident Report which charged that on April 13, 1978, while in transit from the United States Penitentiary, Atlanta, and the Federal Correctional Institution, Petersburg, he attempted or planned to escape by cutting a bar on the Bureau of Prison's bus. (P–164) (U)

219. Following a hearing before the IDC, inmate McCue was placed in Disciplinary Segregation. (McCue) (P–165)

220. On July 4, 1978, while assigned to a cell on the third floor of the SHU, inmate McCue was charged with threatening his cellmate, which charge resulted in an Incident Report. (P–170) (U)

221. As a result of this charge, inmate McCue was immediately moved to the first floor of the SHU on July 4, 1978 without first having received an IDC hearing. (P–169, P–172) (U)

222. Inmate McCue admitted in testimony before this Court that on July 4, 1978, he threatened to take inmate Harmon, his cell mate, "off the count." (McCue)

223. Inmate McCue also testified before this Court that to take a person "off the count," means to kill that person. (McCue)

224. Inmate McCue received his IDC hearing on this charge on July 12, 1978. (P–171) (U)

225. Inmate McCue admitted to the IDC on July 12 that he might have said that he

was going to "take the other inmate off the count" but that it was just a poor choice of words. (P–171) (U)

226. The IDC found that inmate McCue committed the prohibited act of threatening another with bodily harm and placed him in Disciplinary Segregation status on July 12, 1978. (P–171) (U)

227. On September 20, 1978, while assigned to a cell on the third floor of the SHU, inmate McCue was charged with possessing a piece of mirror, a double edged razor blade, and eight small pieces of sandpaper, which charge resulted in an Incident Report. (P–173)

228. As a result of this charge, inmate McCue was immediately placed on the first floor of the SHU in temporary Disciplinary Segregation on Wednesday, September 20, 1978, without first having received an IDC hearing. (P–175, P–176)

229. On Thursday, September 21, 1978, inmate McCue was afforded a hearing before the Unit Discipline Committee which referred the matter to the IDC for disposition. (P–173) (U)

230. Inmate McCue received his hearing before the IDC on September 25, 1978, the following Monday. (U)

231. On September 25, 1978, the IDC found that inmate McCue had committed the prohibited acts charged and placed him in Disciplinary Segregation. (P–174) (U)

232. Defendant Fenton by memorandum of September 25, 1978, reported this temporary placement in Disciplinary Segregation to the Regional Director in compliance with Policy Statement 7400.5D. (P–178) (U)

233. On October 3, 1978, inmates R. McCue, J. Rainey, H. Colomb, P. Jorgenson, J. Bryan and R. Casebeer while assigned to cells on the second and third floors of the SHU, were immediately moved to cells on the first floor of the SHU in temporary Disciplinary Segregation for an investigation into an alleged escape plan without first having received a hearing before the IDC. (P–279, P–307)

234. Defendant Fenton by memorandum of October 4, 1978, reported the temporary placement of inmates Bryan, Jorgenson, Colomb, Casebeer, Rainey and McCue in temporary Disciplinary Segregation at approximately 10:45 P.M., on October 3, 1978, to the Regional Director in compliance with Policy Statement 7400.5D. (P–307) (U)

235. Inmates McCue and Bryan and possibly the other inmates did not receive an Incident Report, nor an IDC hearing, but nevertheless were kept in Disciplinary Segregation for three days.

236. During what was a major disturbance in the SHU on December 16, 1978, inmate McCue was among the group of inmates who exhibited disruptive conduct, i. e., setting fires, throwing burning items from cell windows, refusing to leave their cells and assaulting staff members. (D–45, Fenton, McCue)

237. Inmate McCue was among a group of inmates who had to be removed forcibly from their cells on December 16, 1978 and placed on the first floor of the SHU in Disciplinary Segregation status. (D–45, Fenton, McCue) (U)

238. Restraints were removed from inmate McCue at approximately 11:30 P.M. on December 16, 1978. (Thomas) (U)

239. Defendant Fenton by teletype message of December 18, 1978, reported the temporary placement in Disciplinary Segregation of inmate McCue and the following inmates: Totaro, Buerrero, Knight, Cooley, Patton, Warren, McCollum, Masaro, Marts, DeSantos, Williams, Chappelle, VanScoy, Winston and Kesting to the Regional Director in compliance with Policy Statement 7400.5D. (D–45, Fenton) (U)

240. In the judgment of Defendant Fenton, the conduct of inmate McCue and the others placed on the first floor on December 16, 1978, in temporary Disciplinary Segregation status threatened life and property. (D–45, Fenton) (U)

241. The fifteen inmates placed on the first floor could not be physically controlled within the physical confines of Administrative Detention in the judgment of Warden Fenton. (D–45, Fenton) (U)

242. Inmate McCue received an IDC hearing on December 22, 1978, and was transferred to the United States Penitentiary, Marion, Illinois, on December 26, 1978. (U)

243. Inmate Joseph Bryan's central file contains no Incident Report or evidence of IDC action in connection with his temporary placement in Disciplinary Segregation on October 3, 1978. (Stipulation) (U)

244. With respect to the October 3, 1978 placement in Disciplinary Segregation for investigation of an alleged escape, inmate Bryan was released from Disciplinary Segregation status to Administrative Detention status on October 5, 1978. (Bryan) (U)

245. On June 22, 1978, while assigned to a cell on the third floor of the SHU, inmate Gregory Micklus was charged with having contraband in his cell, namely, a stinger which is an electrical wire "hot-wired" to an electrical circuit within the cell, which charge resulted in Incident Reports against the inmate. (P–184)

246. In the view of the correctional staff, the "hot-wire" posed a very serious security risk and safety hazard because the wire was found to have been plugged into an outlet in the cell. (P–184)

247. The "hot-wire" could have been attached to the cell door and if combined with a minimal amount of water could have caused injury to staff or to inmates. (P–184, Hudson)

248. Electrical "hot wires" or "stingers" are prohibited in the SHU and are not commonly found in the unit. (Hudson)

249. As a result of this charge, inmate Micklus was moved immediately on June 22, 1978 to cells on the first floor of the SHU in Disciplinary Segregation status without first having received an IDC hearing. (P–184, P–185).

250. Micklus did not receive an IDC hearing until June 28, 1978, during which time he was kept in Disciplinary Segregation. (P–184)

251. At his IDC hearing on June 28, 1978, the Committee exonerated inmate Micklus of the charge and ordered the Incident Report and all related documents expunged from his record. (P–184, P–182)

252. Following his IDC hearing on June 28, 1978, inmate Micklus was returned to Administrative Detention status. (P–182) (U)

253. As Correctional Officer Kahn was waking inmate Ronald Newman at about 4:45 A.M. on July 1, 1978, the inmate grabbed the officer and ripped his shirt. (P–197–P–197.1, P–198, Brookmole)

254. Inmate Newman was charged with assaulting a correctional officer in connection with this incident and an Incident Report was issued thereon. (P–197)

255. As a result of this charge, inmate Newman was moved at approximately 5:30 A.M. on July 1, 1978 to the first floor of the SHU without first having been afforded a hearing before the IDC.

256. Sometime during the period July 1 through July 7, 1978, inmate Newman was moved from the first to the third floor. (P–200, Thomas) (U)

257. The investigation of the July 1, 1978, Incident Report was delayed until on or about July 6, 1978, due to a referral of the charge to the Federal Bureau of Investigation. (P–197.1, Brookmole) (U)

258. Inmate Newman received a hearing before the UDC on Friday, July 7, 1978. (P–197) (U)

259. Inmate Newman received his IDC hearing on Monday, July 10, 1978, at which time he was found not guilty of assault but guilty of conduct which disrupts, and placed in Disciplinary Segregation. (P–199) (U)

260. At approximately 8:25 A.M. on December 16, 1978, correctional staff proceeded to inmate Alexander Patton's cell on the second floor of the SHU and ordered him to place his hands through the wicket so that he could be handcuffed. (P–285, Wicka) (U)

261. One of the officers explained to inmate Patton that he had to go downstairs to be interviewed about an Incident Report that had been submitted against him. (P–285, Wicka) (U)

262. Inmate Patton refused to be handcuffed, shouting that he was not going anywhere with anybody. (P–284, Wicka) (U)

263. The correctional officers entered inmate Patton's cell, wrestled him out, and carried him down to the first floor of the SHU. (P–285, Wicka) (U)

264. While inmate Patton was being processed on the first floor he threatened to kill Correctional Officer Shuman if he ever got the chance. (P–285, Wicka) (U)

265. After inmate Patton was placed in a cell on the first floor, he shouted and threatened to kill Officer Shuman and other officers. (P–285, Wicka)

266. On April 14, 1978, inmate Randolph Peoples had been ordered to move from one cell to another in order to make room for inmates arriving on the Lewisburg bus from Atlanta and Petersburg. (P–213) (U)

267. Inmate Peoples refused to move and he was placed in restraints and moved to the first floor of the SHU in Disciplinary Segregation status. (P–213)

268. No memorandum was sent to the Regional Director concerning the incident.

269. An Incident Report was not written on this incident because of an oversight by staff during the emergency conditions in the SHU following arrival of the bus. (P–213)

270. When inmate Peoples was seen by the IDC on April 17, 1978, he again refused to be placed in a cell with another inmate. (P–215) (U)

271. Sometime during the period April 18 through April 24, 1978, inmate Peoples was returned to a cell on the third floor of the SHU. (P–216) (U)

272. Inmate Peoples was released from the SHU at 10:00 A.M. on April 24, 1978. (P–216) (U)

273. On August 27, 1978, while assigned to general population, inmate Peoples was charged with refusing to obey an order of a staff member, which charge resulted in an Incident Report. (P–221) (U)

274. As a result of this charge, inmate Peoples was immediately moved to the first floor of the SHU without first having received an IDC hearing on the charge. (P–279) (U)

275. On August 28, 1978, the UDC found inmate Peoples guilty of conduct which disrupts, gave him a seven day restriction to his unit, and ordered his release to general population. (P–221, D–68) (U)

276. After the UDC hearing on August 28, 1978, inmate Peoples refused to return to his unit in general population, claiming that he was not guilty of the original charge and would rather spend seven days in segregation than one week on restriction. (D–68) (U)

277. Inmate Peoples received an Incident Report for his refusal to return to the general population. (D–68) (U)

278. On September 1, 1978, inmate Peoples was found guilty by the IDC of conduct which disrupts and refusing an assigned program and placed in Disciplinary Segregation. (P–219) (U)

279. On July 31, 1978, while assigned to general population, inmate Johnnie L. Peterson was placed on the first floor of the SHU for investigation, without having first received any hearing before the IDC. (P–224, P–279)

280. A BP–IS–116 form prepared on inmate Peterson reflects that Lieutenant Klopf admitted him to Administrative Detention on July 31, 1978, at 4:40 P.M. for investigation of sex pressure applied by inmate Peterson to another inmate. (P–224, D–50, P–222, P–223, Brookmole)

281. On April 12, 1978, while assigned to a cell on the third floor of the SHU, inmate Salvatore Totaro was charged with insolence, conduct which disrupts, and refusing to obey an order of a staff member, which charge resulted in an Incident Report. (P–229) (U)

282. As a result of this charge, inmate Totaro was immediately moved to the first floor of the SHU on April 12, 1978 in Disciplinary Segregation status without first having been provided a hearing before the IDC. (P–228, P–231, P–232.)

283. No memorandum concerning the placement of Totaro in temporary Disciplinary Segregation was sent to the Regional Director by the Defendant or someone on his behalf.

284. After being taken to the first floor, inmate Totaro was orally abusive toward correctional staff and became violent by kicking and banging on the door to the holding room where he was temporarily housed. (P–232, Hudson)

285. After being placed in cell 111, inmate Totaro continued his disruptive conduct and force was used in order to subdue him long enough to remove his handcuffs. (P–232) (U)

286. On April 13, 1978, inmate Totaro received two additional incident reports for insolence toward a staff member and using abusive or obscene language. (D–21, D–22) (U)

287. The processing of the April 12 and April 13, 1978, Incident Reports was delayed until on or about April 18, 1978, because of the emergency in the SHU precipitated by the arrival of the Lewisburg bus from Atlanta and Petersburg on April 14, 1978. (P–229, D–21, D–22, stipulation re: Atlanta/Petersburg bus incident).

288. Inmate Totaro did not receive an IDC hearing on the incident reports until April 21, 1978, and from April 12, 1978 through the date of the hearing, he remained in Disciplinary Segregation. (P–230)

289. Inmate Totaro was one of the sixteen inmates involved in the disturbance in the SHU on December 16, 1978 and placed on the first floor of the SHU in Disciplinary Segregation status. (D–45) (U)

290. Inmate Oscar Washington was placed on the first floor of the SHU on March 8, 1978, after the staff received reliable information that he and others were planning a food strike. (P–250, P–249 Sinsheimer, Wicka)

291. Inmate Oscar Washington was placed on the first floor to protect him from potential harm from other inmates on the third floor who reportedly had hostile feel-ings against him for planning the food strike. (P–249, P–250, Sinsheimer, Wicka)

292. Inmate Oscar Washington knew about the pending food strike and admitted he was one of the organizers of it. (Washington) (U)

293. Inmate Oscar Washington agreed that the move to the first floor on March 8, 1978, for protective reasons was appropriate. (Washington) (U)

294. On March 27, 1978, while assigned to a cell on the second floor of the SHU, inmate Oscar Washington was charged with refusing to obey an order to move from the second to the third floor, which charge resulted in an Incident Report. (P–254) (U)

295. As a result of this charge, inmate Oscar Washington was moved at approximately 3:25 P.M. to the first floor of the SHU in temporary Disciplinary Segregation status without having first received an IDC hearing. (P–253, P–256, P–257).

296. Defendant Fenton, by memorandum of March 28, 1978, reported the temporary placement in Disciplinary Segregation of inmate Oscar Washington to the Regional Director in compliance with Policy Statement 7400.5D. (P–257) (U)

297. Inmate Oscar Washington received his UDC hearing on Wednesday, March 29, 1978, and his IDC hearing on the morning of Friday, March 31, 1978. (P–254, P–255) (U)

298. On June 13, 1978, while assigned to general population, inmate Rudolph Washington was taken directly from population to the first floor of the SHU for investigation without first having been afforded a hearing before the IDC. (P–266, P–267) (U)

299. Sometime between June 13 and June 19, 1978, inmate Rudolph Washington was moved from the first to the third floor of the SHU. (P–267) (U)

300. Inmate Rudolph Washington was released from the SHU on June 19, 1978. (P–266, P–267) (U)

301. On June 11, 1978, inmate Andre Williams, while assigned to general popula-

tion, was moved directly to the first floor of the SHU for investigation of involvement in an assault on another inmate without having first received a hearing before the IDC. (P–269, P–270) (U).

302. Sometime between June 12, 1978, and June 18, 1978, inmate Andre Williams was moved from the first to the third floor of the SHU. (P–270) (U)

303. On May 7, 1978, while assigned to general population, inmate Willie Williams was charged with possession of home brew, which charge resulted in an Incident Report. (P–273) (U)

304. As a result of this charge, inmate Willie Williams was moved immediately from general population to the first floor of the SHU on May 7, 1978 without first having received a hearing before the IDC. (P–275, P–279) (U)

305. Inmate Willie Williams did not receive a hearing before the IDC until May 10, 1978, and from May 7, 1978 through the date of the hearing, he was kept on the first floor of the SHU. (U)

306. The IDC found inmate Willie Williams guilty of the charge of possessing "home brew", placed him in Disciplinary Segregation and scheduled him for a review hearing on May 17, 1978. (P–274) (U)

307. On May 17, 1978, inmate Willie Williams was released from the SHU following his review hearing before the IDC. (P–277, P–276) (U)

308. On September 8, 1978, inmate Joseph Bryan was moved from the third floor to the first floor of the SHU and placed in temporary Disciplinary Segregation status without first receiving a hearing before the IDC after a search of his property in cell 310 revealed hacksaw blades concealed inside a toothpaste tube and inside a paperback book. (P–300, P–301, P–303).

309. Also concealed in the paperback book was a note which described plans for an attempted escape. (P–300, P–301, P–303) (U)

310. Inmate Joseph Bryan was charged with having hacksaw blades, which charge resulted in an Incident Report. (U)

311. Defendant Fenton, by memorandum of September 13, 1978, reported the temporary placement in Disciplinary Segregation of inmate Bryan to the Regional Director in compliance with Policy Statement 7400.5D. (P–304) (U)

312. Inmate Bryan received two incident reports for possession of the hacksaw blades and for planning an escape; the investigation of both was delayed until September 18, 1978, because of the referral of the charges to the Federal Bureau of Investigation. (P–300, P–301, Brookmole) (U)

313. Inmate Bryan received his hearing before the IDC on one of the Incident Reports on September 20, 1978, at which time the Committee found him guilty of planning an escape and possession of escape paraphernalia and placed him in Disciplinary Segregation. (P–302) (U)

314. On April 12, 1978, the IDC found inmate Emmit Brager guilty of a March 30, 1978, Incident Report which charged him with assaulting another inmate by striking him twice with a sharpened instrument. (D–47, D–49)

315. On May 29, 1978, inmate Emmit Brager was charged with using abusive language, conduct which disrupts, refusing an order, and threatening staff, which charges resulted in an Incident Report. (P–308) (U)

316. As a result of this charge, inmate Brager was immediately taken to the first floor of the SHU and placed in temporary Disciplinary Segregation status. (U)

317. Warden Fenton notified the Regional Director of this temporary placement in Disciplinary Segregation.

318. Brager received an IDC hearing on May 31, 1979 and was found guilty of the charges contained in the May 29, 1978 Incident Report. (P–308, P–309)

319. At approximately 10:45 A.M. on December 2, 1978, inmate Brager while assigned to a cell on the third floor of the SHU refused to obey an order given him by Correctional Officer Shuman to return a law book Brager was attempting to remove from the inmate law library on the first floor of the SHU. (P–321, Crandle) (U)

320. After Officer Shuman ordered inmate Brager to give him the book a second time, inmate Brager pushed Officer Shuman out of his way. (P–321) (U)

321. Additional staff were summoned and inmate Brager was returned to his third floor cell and sometime later was placed in temporary Disciplinary Segregation status on charges of assaulting a person, refusing to obey an order of any staff member, attempting to steal and conduct which disrupts. (P–321, P–316)

322. As a result of this incident, Brager received an Incident Report.

323. Defendant Fenton, by memorandum of December 4, 1978, reported the temporary placement of Emmit Brager in Disciplinary Segregation status to the Regional Director. (P–321.1) (U)

324. During an inventory of inmate Brager's personal property on December 2, 1978, correctional officers discovered a twenty-dollar bill and a five-dollar bill in an object that looked like a finger from a rubber glove. (P–318, P–319) (U)

325. Inmate Brager received an Incident Report charging him with possession of money on December 3, 1978. (P–318, P–319) (U)

326. The December 2, 1972 Incident Report charging inmate Brager with assault, refusal of an order, attempted stealing and conduct which disrupts was referred to the Federal Bureau of Investigation which declined to investigate on December 4, 1978. (P–316, Brookmole) (U)

327. Following the declination by the Federal Bureau of Investigation inmate Brager was afforded his UDC hearing on December 5, 1978, and his IDC hearing on December 6, 1978. (P–316, P–317, P–318) (U)

328. At his IDC hearing on December 6, 1978, inmate Brager was found guilty of the prohibited acts as charged and placed in Disciplinary Segregation. (P–317, P–320) (U)

329. Between December 2 and December 6, 1978, Brager remained in temporary Disciplinary Segregation status.

330. On April 4, 1978, inmate Larry Lucas refused to obey an order to move from one cell to another on the third floor of the SHU and received an Incident Report for this refusal. (P–322, Hudson) (U)

331. As a result of this charge, inmate Lucas was immediately placed on the first floor of the SHU in Disciplinary Segregation status, without first having received a hearing before the IDC. (U)

332. During the strip search of inmate Lucas prior to placement on the first floor, Correctional Supervisor Hudson found in Lucas's pants pocket a small, round metal object which appeared to be a home-made handcuff key. (P–322.1, Hudson) (U)

333. On April 7, 1978, inmate Lucas was afforded a hearing before the IDC for the two April 4 Incident Reports. (P–324, P–326)

334. The IDC found that inmate Lucas committed the prohibited acts charged and placed him in Disciplinary Segregation. (P–324) (U)

335. With respect to inmate Larry Lucas, his central file contains no memorandum to the Regional Director indicating that his April 4, 1978, placement on the first floor of the SHU for refusing to obey an order was a temporary placement in Disciplinary Segregation. (Stipulation) (U)

336. On April 4, 1978, Correctional Supervisor Hudson served in the capacity of Evening Operations Supervisor, or the Correctional Supervisor in charge of the institution on the Evening Watch. (D–32, Hudson) (U)

337. On June 10, 1978, while assigned to a cell on the third floor of the SHU, inmate Lucas was charged with possessing a sharpened instrument and attempting or planning an escape which charge resulted in an Incident Report. (P–327)

338. As a result of this charge, inmate Lucas was immediately placed on the first floor of the SHU, and remained there until June 15, 1978 when he was taken back to the third floor.

339. Inmate Lucas did not receive an IDC hearing on this incident report until June 16, 1978. (U)

340. The IDC placed inmate Lucas in Disciplinary Segregation on June 16, 1978. (P–328) (U)

341. On June 15, 1978, while assigned to a cell on the third floor, inmate Lucas was placed in temporary Disciplinary Segregation on the first floor of the SHU for allegedly possessing a mirror and a pair of nail clippers. (U)

342. With respect to inmate Larry Lucas, his central file contains no Incident Report or evidence or IDC action in connection with his temporary placement in Disciplinary Segregation on June 15, 1978. (Stipulation) (U)

343. Warden Fenton notified the Regional Director of this temporary placement in Disciplinary Segregation. (P–329)

## II. Discussion.

This action relates to the conditions of confinement on the first floor of the Special Housing Unit. Warden Fenton has been substituted for Floyd E. Arnold, the original Defendant in this case, pursuant to F.R.Civ.P. 25(d). As the Court has previously noted, in the prior opinion in this case, *Jordan v. Arnold*, 408 F.Supp. 869 (M.D.Pa.1976), judges ordinarily should defer in matters of security and prison administration to the expertise of corrections officials. However, they cannot "abdicate their constitutional responsibility to delineate and protect fundamental liberties," *see Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974), and just as significantly a court cannot permit deliberate violations of its orders. The purpose of civil contempt is to compel obedience to orders and decrees so as to enforce the rights of litigants previously determined. Thus, civil contempt is both remedial and coercive in nature. *See United States v. Rizzo*, 539 F.2d 458 (5th Cir. 1976); *Palmigiano v. Garrahy*, 448 F.Supp. 659 (D.R.I. 1978).

Defendant first contends that the doctrine of exhaustion of administrative remedies applies to this civil contempt proceeding in order that prison officials be given the opportunity to remedy claims of the Plaintiff class before a motion to hold the Defendant in contempt is filed. The purpose of the doctrine of exhaustion of administrative remedies is to give a governmental agency the opportunity to investigate alleged violations of rights and to take appropriate action before such matters are presented to a court. *See U. S. ex rel. Sanders v. Arnold*, 535 F.2d 848 (3d Cir. 1976); *Waddell v. Aldredge*, 480 F.2d 1078 (3d Cir. 1973). The Court is of the view that the doctrine of exhaustion of administrative remedies does not apply to an action seeking an order of contempt. There is nothing that the Bureau of Prisons could do to change the fact of a violation of the Court's order. Furthermore, it would be an unnecessary burden on the Plaintiffs to require them first to present allegations of a violation of this Court's order within administrative channels. This would be similar to requiring a prisoner still confined after his petition for a writ of habeas corpus has been granted by the Court to seek compliance with the writ through administrative channels before seeking enforcement from the Court. The doctrine of exhaustion of administrative remedies has no logical application to a motion for contempt.

In a civil contempt action the proof of the Defendant's contempt must be demonstrated by clear and convincing evidence. *Schauffler v. Local 1291, International Longshoremen's Association*, 292 F.2d 182 (3d Cir. 1961); *see also United States v. Rizzo*, 539 F.2d 458 (5th Cir. 1976). A mere preponderance of the evidence will not suffice. *Louisiana Education Association v. Richland Parish School Board*, 421 F.Supp. 973 (W.D.La.1976), aff'd, 585 F.2d 518 (5th Cir. 1978). Plaintiffs do not dispute that the burden of proof of Defendant's contempt must be by clear and convincing evidence.

On March 27, 1979, the Defendant filed a motion for relief from judgment accompa-

nied by a brief seeking an order vacating the Court's judgment in the above-captioned case set forth in orders dated March 25, 1976 and March 14, 1979. On April 11, 1979, the Plaintiffs filed a brief in opposition to the Defendant's motion. In his motion for relief, the Defendant contends that the Court may vacate its orders pursuant to F.R.Civ.P. 60(b)(5) or 60(b)(6). Defendant contends that the evidence adduced at the hearing demonstrates that he and his successors should be relieved from the Order of March 25, 1976, apparently because Defendant believes the evidence shows it is no longer equitable for the Order to have prospective application. Furthermore, the Defendant suggests that exceptional and extraordinary circumstances exist in this case which justify relief pursuant to F.R.Civ.P. 60(b)(6). It is Defendant's argument that the March 25, 1976 Order assigns him responsibilities which assume a permanent priority for Defendant and his successors. However, the Defendant contends that because he has other priorities whose assessment depends on his knowledge and abilities as a prison administrator the March 25, 1976 Order unnecessarily involves the Court in the day to day operations of the prison.

■ In their opposing brief, Plaintiffs note that the Defendant has failed to suggest any change in operative facts which would justify the modification or vacating of the Court's order. *See Tobin v. Alma Milis*, 192 F.2d 133 (4th Cir. 1951), *cert. denied*, 343 U.S. 933, 72 S.Ct. 769, 96 L.Ed. 1342 (1952). Plaintiffs contend, and the Court agrees, that modification of an injunction is appropriate only when the danger which the Court's decree was meant to prevent has almost ceased, a serious wrong has resulted from new and unforeseen conditions, and the hardship of the enjoined party is extreme, unexpected, or oppressive. *See Humble Oil and Refining Co. v. American Oil Company*, 405 F.2d 803 (8th Cir.), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969). Although the Defendant has suggested that the March 25, 1976 Order is no longer equitable and that extraordinary circumstances exist in this case, he has not suggested a sufficient change in

circumstances to warrant vacating the judgment in this case. Nevertheless, both parties have suggested that the Court may modify its prior order to guarantee appropriate remedies for the issues in this case. *See United States v. United Shoe Machinery Corporation*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968); *International Society for Krishna Consciousness of Western Pennsylvania, Inc. v. Griffin*, 437 F.Supp. 666 (W.D.Pa.1977). In fashioning the proper relief in the above-captioned case, the Court will give appropriate consideration to proposals to modify its order of March 25, 1976.

From the evidence adduced at the hearing on the motion to hold the Defendant in contempt and from the documents filed by the parties, the Plaintiffs make essentially three claims. First, they contend that the Defendant violated paragraphs 1 and 2 of the Court's order dated March 25, 1976 by failing adequately to inspect and maintain the ventilation system in the Lewisburg Penitentiary Special Housing Unit and by failing to provide the minimum 9 air changes per hour per cell set forth in that order. Second, the Plaintiffs allege that the Defendant has violated ¶ 4 of the order by failing to provide inmates confined in disciplinary segregation with at least two hours of exercise per week and two showers per week. Third, it is the contention of the Plaintiffs that the Defendant has violated Bureau of Prisons Policy Statement 7400.-5D, July 7, 1975 on inmate discipline with regard to maintaining the first floor section of the Special Housing Unit and the placement of individuals in disciplinary segregation in contravention of Paragraphs 3 and 5 of the order. The Court will consider these claims *seriatim*.

### A. Ventilation.

Plaintiffs contend that the Defendant has violated the Court's order with regard to ventilation in two ways: the failure to provide inspections annually by qualified ventilation personnel and the failure to maintain a ventilation system which provides 9 air changes per hour per cell. The Defendant

testified that soon after his arrival at the Lewisburg Penitentiary, he read the Court's order dated March 25, 1976. In talks with an associate warden, he inquired as to the institution's compliance with the Court's order. Defendant testified that he was told that the provisions with regard to ventilation as well as the other sections of the order were being obeyed. However, in April of 1978, a letter from counsel for the Plaintiffs led Defendant Fenton to the discovery that no documentation of the inspections of the ventilation system was being made. Defendant ordered periodic inspections of the ventilation system to be conducted. Defendant Fenton was subsequently told that such inspections were conducted and records kept by James E. Swartz, an employee of the institution's mechanical services division who holds a Bachelors of Science Degree in mechanical engineering from Bucknell University.

The Defendant appears to contend that the inspections of the ventilation system were being made in compliance with the Court's order, although no record was kept of such inspections prior to April, 1978. There was testimony that Franklin E. Cook, a pipefitter in the institution, conducted visual and some limited mechanical inspections in 1977. There is no evidence to indicate that Mr. Cook was a qualified ventilation expert and in fact he admitted this on the stand. From the testimony elicited in court, the Court is of the view that no inspections of the ventilation system by qualified personnel occurred in 1977. In 1978, inspections were conducted by James E. Swartz. However, it became clear in Court that Mr. Swartz, although holding a degree in mechanical engineering, is not a qualified ventilation person. There was no substantial evidence to rebut Plaintiffs' claim that there were annual inspections by qualified ventilation personnel. A violation of the Court's order has occurred for failure adequately to inspect the ventilation system in 1977 and 1978.

▮ Defendant has suggested that Warden Fenton could not be held in contempt of Court unless it is shown that he had knowledge of the violations of the Court's order. A finding of civil contempt may be made if it is shown that a party has violated his obligations imposed by a court decree by failure of diligence, ineffective control, and lack of purpose in effectuating the requirements of the decree. *See Palmigiano v. Garrahy*, 448 F.Supp. 659 (D.R.I. 1978). The Court is of the view that Defendant Fenton is like a corporate official in that he must do all that he reasonably can to see that a court order is obeyed. *Cf. United States v. Fleischman*, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950); *United States v. Joyce*, 498 F.2d 592 (7th Cir. 1974). Because Fenton has official responsibility for the conduct of his staff, he must see insofar as reasonably possible, that there is compliance with the Court's order. Failure to comply with this duty can result in civil contempt. *See United States v. Greyhound Corporation*, 363 F.Supp. 525, supplemented in 370 F.Supp. 881 (N.D.Ill.), *aff'd* 508 F.2d 529 (7th Cir. 1973). The Defendant was aware of the Court's order governing ventilation. Further, the Defendant made inquiries as to compliance by the institution staff with that order. The Defendant testified that he would examine the results of tests of the ventilation system only if they were pointed out to him as deficient and that he delegated the responsibility to see that the tests were properly conducted by qualified personnel to subordinates. Although the Court is aware of the need for prison officials to delegate responsibility, the Court also notes that the Defendant is responsible for the conduct of his staff within the institution and that the Defendant was under an obligation under the Court's order dated March 25, 1976 to provide for an annual inspection of the ventilation system by qualified ventilation personnel. The Court does not share the apparent view of the Defendant that merely giving orders to subordinates discharges his duty under the order. The Defendant had or should have had knowledge of the violations of the Court's order.

▮ The Plaintiffs have also contended that the Defendant violated the Court's or-

der in failing to provide a ventilation system which would maintain nine air changes per hour per cell. In support of their argument, the Plaintiffs submit that the Court's reference to nine air changes per hour per cell referred to fresh air changes. The Court's order of March 25, 1976 does not prescribe that the air changes must be totally fresh air changes. The Court did not intend that the nine air changes per hour per cell be comprised merely of recirculated air, but it is not clear from the order how much of the air, if any, could be recirculated air. Because this portion of the Court's order is susceptible of differing interpretations and because it appears from the testimony of Mr. Swartz regarding tests done in 1978 that by virtue of his calculations the Defendant was complying with the Order, the Court does not believe that the Defendant should be held in contempt for failing to provide nine fresh air changes per hour per cell. See *Theriault v. Carlson*, 495 F.2d 390 (5th Cir.), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *Thompson v. Johnson*, 410 F.Supp. 633 (E.D.Pa.1976). At trial, there was testimony regarding a more appropriate standard for the provision of proper ventilation. As noted above, the Court will consider at a later phase of this case on motion an appropriate modification of its order regarding ventilation.

### B. Showers and Exercise.

■ Plaintiffs contend that the Defendant and his subordinates have routinely violated ¶ 4 of the Court's order requiring at least two hours of exercise per week and at least two showers per week for inmates incarcerated in disciplinary segregation on the first floor of the SHU. The Court's order also indicated that this requirement could be dispensed with if security or safety reasons dictate otherwise and the exceptions are documented. The Plaintiffs suggested numerous instances when this paragraph of the order was violated. The basis of the Plaintiffs' evidence was essentially the testimony of individual inmates. This was directly refuted by the BP–IS–111 forms which document among other things the times and dates when inmates are given showers and recreation periods. These forms indicated that in most instances inmates were given the appropriate number of showers and recreation periods. In all the instances brought to the attention of the Court at trial where an inmate did not receive the required number of showers and recreation periods there was documentation of the reasons for this failure. In most cases, security precautions allegedly justified the omission. There was one indication of improper documentation with regard to the showers and exercise given to inmate McCue on April 14, 1978. After an investigation, it was determined that a prison guard had made the entry in the wrong column. *See* Defendant's Exhibit 31 and the entry corrected.

Although there has been some evidence of failure on the part of the Defendant to provide inmates on the first floor of the SHU with the appropriate number of showers and exercise, this evidence has not been so clear and convincing as to require the Court to reject the BP–IS–111 forms offered by Defendant. Consequently, the Court does not find the Defendant in contempt of the Court's order with regard to ¶ 4 of the March 25, 1976 Order. Given the Court's disposition of this claim, it is unnecessary to reach Defendant's further argument that he had no knowledge of violations of ¶ 4.

### C. Provisions of Policy Statement 7400.5D.

■ In the Court's order dated March 25, 1976, 408 F.Supp. 869 (M.D.Pa.1976), the Court noted in finding of fact 10 that at the time the named Plaintiffs were brought to the first floor of the SHU, cells 101, 102, 103, and 114 were classified as disciplinary segregation cells. In finding of fact No. 11 it was noted that cells 104 through 113 inclusive were classified as either administrative detention or disciplinary segregation cells. Sometime after Warden Fenton assumed his duties at the Lewisburg Penitentiary, the designation of cells 101, 102, 103 and 114 as disciplinary segregation was changed. The policy of prison officials was

altered so that any of the cells on the three floors of the Special Housing Unit could be used to house individuals either in disciplinary segregation status or in administrative detention status.

The Plaintiffs contend that this procedure violates Bureau of Prison Policy Statement 7400.5D which was specifically incorporated into the Court's order in Paragraphs 3 and 5 thereof. Paragraph 11 of that statement indicates that each institution having the need for such facilities will establish special housing units consisting of two types, administrative detention and disciplinary segregation. Plaintiffs contend that the policy statement requires that physically separate individual units be set up for disciplinary segregation purposes and for administrative detention purposes. Defendant on the other hand points to the definitions of administrative detention and disciplinary segregation contained in the same Bureau of Prisons policy statement which indicate that disciplinary segregation and administrative detention are statuses of confinement. Bureau of Prisons Policy Statement 7400.5D, paragraph 11. These provisions of the policy statement are inconsistent. On the one hand, the statement discusses housing units of two types and on the other it speaks of two statuses of confinement. Although it is arguable that the four designated cells on the first floor of the SHU or the entire first floor cell block should have been used solely for disciplinary segregation purposes, the inconsistency in the policy statement lends credence to the position of the Warden that any cell could be used for an inmate in disciplinary segregation or in administrative detention status. The testimony of the general counsel of the Bureau of Prisons who was one of the drafters of the Bureau of Prisons Policy 7400.5D supports the Warden's position. In the light of the ambiguousness of the policy statement, the Court is of the view that Warden Fenton should not be held in contempt for the placement of inmates on the first floor in administrative detention status.

Plaintiffs have also contended with regard to the placement of individuals in administrative detention status on the first floor that inmates so placed were not in actuality in administrative detention status because they did not receive the privileges required by prison policy for inmates in that status. Paragraph 11(a)(3) of the Bureau of Prisons Policy Statement 7400.5D indicates that unless there are compelling reasons to the contrary, individuals in administrative detention status should receive commissary privileges, reasonable amounts of personal property and exercises which exceed those made available to inmates in disciplinary segregation. The testimony of a number of inmates suggested that inmates on the first floor of the SHU in administrative detention status did not receive personal property or commissary privileges. Plaintiffs' Exhibit 98, a letter from Warden Fenton to counsel for the Plaintiffs dated April 20, 1978, concerning the movement of inmates believed to be involved in a food strike and conspiracy to seize control of the detention unit states that these inmates were moved to the first floor of the SHU and placed in administrative detention status. Warden Fenton indicated that these inmates were given at least some of the privileges normally afforded detention inmates. It is the Court's view that neither the testimony of the inmates nor the Warden's letter is clear and convincing evidence of the denial of privileges to inmates in administrative detention status who have been placed on the first floor. The Court notes that by and large the Defendant repudiated Plaintiffs' claim that they were denied privileges while in administrative detention status. To the extent that Defendant did not respond to Plaintiffs' assertions of loss of privileges the Court is of the view that the trial judge is not required to accept the Plaintiffs' testimony even if uncontradicted. The Court can determine that the testimony of the Plaintiffs does not carry the burden of proof. *See In Re Decker*, 595 F.2d 185 (3d Cir. 1979). There has not been the requisite showing to hold Warden Fenton in contempt on Plaintiffs' claim that they have been denied privileges while in administrative detention status while on the first floor of the SHU.

Plaintiffs also contend that in a variety of circumstances they have been placed on the first floor of the SHU in disciplinary segregation status or temporary disciplinary segregation status without a hearing before the Institution Disciplinary Committee (IDC) within the time required by Policy Statement 7400.5D. Warden Fenton first contends that even if violations of Policy Statement 7400.5D have occurred, he is without sufficient knowledge of such violations to be held in contempt of Court. The Court is of the view that this contention of the Warden is without merit. Plaintiffs' Exhibit 289, a letter from Warden Fenton to Senator Hatfield, regarding inmate Robert Chappelle, was written in response to Chappelle's claim that members of the institution staff had engaged in acts of violence against the inmates in the Segregation Unit. In that letter, Defendant Fenton flatly states that "all inmates confined in our Administration Detention Unit and Disciplinary Segregation Unit are treated in accordance with Bureau of Prisons Policy Statement No. 7400.5D dated July 7, 1975 on 'Inmate Discipline.'" Warden Fenton testified that while this letter was not written by him, he read and signed it. Thus, it is apparent that Warden Fenton contends that the Bureau of Prisons Policy on Inmate Discipline has been properly observed. To make the statement to Senator Hatfield, Warden Fenton must have had knowledge or should have had knowledge of all that occurred with regard to inmate discipline on the first floor of the SHU. Furthermore, the Court notes that with respect to the placement of an inmate in temporary disciplinary segregation status, the Warden is required to send a memorandum to the regional director setting forth the reasons for such placement. The Warden would then have responsibility to see that the Bureau of Prisons Policy Statement is complied with with respect to the conducting of the IDC hearing for those inmates. Finally, the Court notes that Warden Fenton upon the beginning of his tenure at the Lewisburg Penitentiary indicated that he essentially changed all the procedures followed in the institution. Given this far-reaching revision of administrative procedures, it cannot fairly be said that Warden Fenton had no knowledge of the manner in which those procedures were followed. Although it would probably be extreme to require Warden Fenton or his successors personally to observe every placement on the first floor for compliance with the Court's order, the Defendant has a clear responsibility to insure that the order was obeyed. It appears that Warden Fenton had sufficient knowledge of the activities in the SHU with regard to the placement of individuals in disciplinary or temporary disciplinary segregation status for responsibility to attach to him.

Paragraph 11(a)(4) of Bureau of Prisons Policy Statement 7400.5D provides that an inmate who is causing a serious disruption by threatening life or property in administrative detention and who cannot be controlled within the confines of administrative detention may be moved temporarily to disciplinary segregation pending a hearing before the IDC. However, such temporary placement in disciplinary segregation is not to exceed 3 days. On December 16, 1978, a very serious disturbance occurred in the Special Housing Unit. As a result of this disturbance, a number of inmates were that day placed in temporary disciplinary segregation status. Approximately six of the inmates were given IDC hearings on their incident reports on December 22, 1978. Approximately seven other inmates did not receive an IDC hearing before January 3, 1979. This is a clear violation of ¶ 11(a)(4). Defendant contends that the dire emergency in the SHU excuses the failure to provide a timely IDC hearing. Furthermore, the Defendant notes that because of the seriousness of this incident, the matter was referred to the Federal Bureau of Investigation for investigation. Defendant represents that Bureau of prisons interpretations permit deferment of an IDC hearing, pending completion of an FBI investigation into the incident. As a result, Defendant contends that an IDC hearing could not proceed before the FBI

completed its investigation. The Defendant submits that the Bureau of Prisons Policy Statement is not a statute or a regulation but is a statement of internal operating procedures, and as a consequence the Bureau of Prisons' interpretation of the policy statement should be upheld. It apparently is Defendant's position that referral of a matter to the FBI or the existence of an emergency, *see Carlo v. Gunter*, 520 F.2d 1293 (1st Cir. 1975); *Morris v. Travisono*, 509 F.2d 1358 (1st Cir. 1975), excuses strict compliance with the policy statement and that this interpretation of the policy statement by the Bureau of Prisons should be given controlling weight under the circumstances of this case. *See Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29 (3d Cir. 1976). Courts are obligated to give deference to an administrative agency's construction of the language of a statute and of an agency's interpretations of regulations it has drafted if the constructions or interpretation are reasonable. *See Lucas Coal Company v. Interior Board of Mine Operations Appeals*, 522 F.2d 581 (3d Cir. 1975). An administrative interpretation of regulations should be given controlling weight unless it is plainly erroneous or inconsistent with the regulation itself. *McCullough v. Redevelopment Authority of Wilkes-Barre*, 522 F.2d 858 (3d Cir. 1975). Warden Fenton submits that he is charged through the Bureau of Prisons by the Attorney General to provide among other things discipline and security within an institution and that his interpretation of the policy statement as excusing compliance in the event of an emergency or other special circumstances should be given deference by the Court.

▆▆ Defendant's position is incorrect. If the Warden's or Bureau of Prisons' reading of the Policy Statement that investigation by the FBI or emergencies in the SHU excused timely IDC hearings were reasonable, then he would not be found in contempt of the Court's order. But it is the Court's view that the Defendant's interpretation of the policy statement is not reasonable and is inconsistent with the plain meaning of the regulations. Paragraph 11(a)(4) makes

no mention of investigations by the FBI or of the existence of emergencies which would excuse hearings before the IDC within three days of the placement of an individual in temporary disciplinary segregation. There is no ambiguity in the policy on this issue. Mindful of the Third Circuit's direction in *Concerned Residents of Buck Hill Falls* to read interrelated parts of the policy statement together, the Court does not find any provision of the Policy Statement which reasonably permits the Defendant to abandon the requirements of that statement. It is true that ¶ 7(b) notes that investigations of an incident should be suspended and that the inmate should not be questioned until the FBI completes its interviews. There is no indication that the IDC could not meet and merely place the inmate in administrative detention status pending the completion of an investigation by the FBI or the end of the emergency. If the Defendant's argument that an individual may be placed in administrative detention status on the first floor of the SHU is correct, then the Court sees no reason why an inmate could not be given the proper privileges on the first floor for an inmate in administrative detention status while the security of the institution is maintained.

▆▆. Defendant has also suggested that the lateness in holding IDC hearings for inmates involved in the December 16, 1978 incident was excused because two holiday weekends, Christmas and New Years, contributed to the delay. Defendant further submits that it was difficult to secure impartial hearing officers for IDC and UDC proceedings. Like the Defendant's reasoning with respect to investigations by the FBI and emergencies in the SHU, this argument must also be rejected. The Policy Statement does not explicitly or implicitly permit the postponement of IDC hearings because of intervening holidays or the difficulty in securing impartial hearing officers. Given the language of the Policy Statement, it would be unreasonable to imply such an exception.

Defendant has argued that the policy statement is not even a regulation but rather is an internal operating procedure and as such is not a rule of law binding on the agency. *See Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29, 38 (3d Cir. 1976). This argument must be rejected. The Court's order dated March 25, 1976 specifically incorporates in ¶ 3 and ¶ 5 the language of the Bureau of Prisons Policy Statement. As a result, the provisions of the Policy Statement become more than internal operating procedures, they are now part of a court order. As such, they are not as susceptible to agency interpretation and Defendant is not entitled to rely solely on the Bureau's interpretation of the policy. In the Court's view the policy should be more strictly construed under the circumstances.

There are a number of other instances in which inmates were placed on the first floor in temporary disciplinary segregation status and were not given a hearing before the IDC within the required three days. Those instances include:

(a) On September 8, 1978, inmate Joseph Bryan was moved to the first floor of the SHU and placed in temporary disciplinary segregation status without first receiving a hearing before the IDC. Bryan received a hearing before the IDC on September 20, 1978. The hearing before the IDC was allegedly delayed due to an investigation until September 18, 1978 by the FBI.

(b) On October 3, 1978, inmate McCue was placed in temporary disciplinary segregation status on the first floor but did not receive an IDC hearing on this placement.

(c) On October 5, 1978, inmates Jordan and Taylor were placed in temporary disciplinary segregation status and remained in said status until October 11, 1978. Inmate Jordan was seen by the IDC for a seven-day review on or about October 11, 1978 and was placed in administrative detention status pending investigation and review by the UDC. Jordan received an IDC hearing on October 18, 1978. The delay in conducting the IDC hearing was allegedly due to investigation and referral of the charges to the Federal Bureau of Investigation.

(d) On November 28, 1978, inmate Kesting was moved to the first floor of the SHU into temporary disciplinary segregation status and remained in temporary disciplinary segregation until sometime during the week of December 5, 1978. Kesting received an IDC hearing on December 13, 1978. The delay in holding the IDC hearing was allegedly due to referral of the charges to the FBI.

(e) On December 2, 1978, inmate Emmit Brager was placed on the first floor of the SHU in temporary disciplinary segregation status and did not receive his IDC hearing until December 6, 1978. The IDC hearing on the charges against Brager were allegedly delayed because of investigation by the FBI.

In other instances, the Defendant argued that the failure to provide an IDC hearing within three days to an inmate placed in temporary disciplinary segregation status was excused because IDC hearings were held only on Mondays, Wednesdays, and Fridays. Consequently, he argued that an incident which occurred on Thursday could not be reviewed by the IDC until Monday, which would be more than three days later. An IDC hearing would not be held on a Thursday incident on Friday because of the need to investigate the incident and to provide the inmate with witnesses at his hearing. Paragraph 11(a)(4) does not contain any exception from the three-day time limit because of the policy of the IDC of conducting hearings only on Mondays, Wednesdays, and Fridays. Fair reading of the provision requires an IDC hearing within 3 days of placement of an inmate in temporary disciplinary segregation status. There are a number of examples of this type of violation. These include:

(a) On March 27, 1978, inmate Oscar Washington was placed in temporary disciplinary segregation status without first receiving an IDC hearing. Washington received an IDC hearing on Friday, March 31, 1978.

(b) On September 20, 1978, inmate Richard McCue was placed in temporary disciplinary segregation status without first having received an IDC hearing. McCue received his hearing before the IDC on September 25, 1978, the following Monday.

On June 22, 1978, inmate Gregory Micklus was moved to the first floor of the SHU and placed in disciplinary segregation status. Micklus did not receive an IDC hearing until June 28, 1978. It is not clear whether this placement in disciplinary segregation was a temporary placement. If it was, the IDC hearing was not held within the required three days and no memo from the Warden to Regional Director Farkas was sent. However, because the record was ordered expunged, it is not likely that a copy of the memo would have been retained. If, on the other hand, Micklus was placed in disciplinary segregation rather than temporary disciplinary segregation, such a placement violates ¶ 11(b)(1) of the policy statement because that section of the statement permits the placement of an inmate in disciplinary segregation only by direction of the IDC following a hearing. There are other examples of placement in disciplinary segregation without a prior hearing by the IDC. These include:

(a) On April 4, 1978, inmate Lucas was placed on the first floor of the SHU in disciplinary segregation status without a prior hearing before the IDC. Defendant has argued that Lucas was placed on the first floor in temporary disciplinary segregation. Although P–323 indicates that the placement was in disciplinary segregation, the Court notes that even if the Defendant is correct, a violation of the Policy Statement has occurred because no memorandum from the Warden regarding a temporary placement of Lucas was sent.

(b) On April 12, 1978, inmate Totaro was placed on the first floor of the SHU in disciplinary segregation status without a prior hearing. The processing of the April 12, 1978 incident report was delayed because of an emergency precipitated by the arrival of the Lewisburg bus from Atlanta on April 14, 1978. As with a temporary placement in disciplinary segregation, there is no exception made in the Policy Statement for placement in segregation without a timely hearing because of an emergency.

(c) On April 14, 1978, inmate Peoples was placed in disciplinary segregation without a hearing.

(d) On August 14, 1978, inmates Wellons, Harris, and Bias were placed in disciplinary segregation without a prior hearing.

█ On April 1, 1978, inmate Hill was placed in temporary disciplinary segregation status and was released from the SHU on April 3, 1978. On October 3, 1978, inmate Bryan was placed in temporary disciplinary segregation status and was released from that status on October 5, 1978. Paragraph 11(a)(4) of the Bureau of Prisons' Policy Statement allows placement in temporary disciplinary segregation for up to three days pending a hearing before the institution discipline committee. It is the Court's view that that section requires a hearing at some time with regard to temporary placement in disciplinary segregation status. If the inmate continues in disciplinary segregation status, that hearing must be held within 3 days. If an inmate is released from temporary disciplinary segregation status, that hearing must occur at some time. There is no indication in this paragraph that the IDC is excused from conducting a hearing on the placement in temporary disciplinary segregation status if the individual is released before the end of three days. This provision as to holding an IDC hearing serves two purposes. First, it enables the IDC to review all placements in temporary disciplinary segregation to see that such placements occur because of a serious disruption which threatens life or property and that the individuals so placed cannot be controlled within the physical confines of administrative detention. Second, it avoids the possibility that an unscrupulous individual might place an inmate in disciplinary segregation status for two and one half days, then remove him for

a day and replace him in disciplinary segregation for another two and one half day period and so on, thereby subjecting an inmate to a long but not continuous period in disciplinary segregation avoiding review by the IDC. The placement of Hill in temporary disciplinary segregation status coupled with the failure to provide an IDC hearing violates Bureau of Prisons policy.

Paragraph 11(a)(4) appears to require that prison officials indicate that the inmate placed temporarily in disciplinary segregation cannot be safely transferred to the institution hospital. Although the language in the policy on its face applies to all placements in temporary disciplinary segregation, that would be an absurd result. The Plaintiffs concede that this reference to the institution hospital can fairly be read as referring only to an inmate who is suicidal or requires special medical treatment.

 Defendant argues in a post-hearing memorandum that any violations of the Court's order should be excused because he has proceeded with reasonable diligence, has not been dilatory in complying with the Order and has not spent long periods with no effort to comply at all. *See Palmigiano v. Garrahy*, 448 F.Supp. 659 (D.R.I.1978). Defendant urges that the Court proceed with measured caution. The Court is reluctant to interfere with the administration of prisons. However, Defendant and his subordinates have violated the policy statement over a period of at least one year and on more than an occasional basis.

The Court has found Warden Fenton to be in violation of the Court's order in two basic ways. First, he has not had the ventilation system at the institution inspected annually by a qualified ventilation person. Second, on numerous instances individuals were placed on the first floor of the SHU in disciplinary segregation without receiving an IDC hearing at the appropriate time in violation of the Bureau of Prisons Policy 7400.5D.

### III. Conclusions of Law.

1. The doctrine of exhaustion of administrative remedies does not apply to this civil contempt proceeding.

2. A finding of civil contempt follows only from clear and convincing proof.

3. The Court's order dated March 25, 1976 has been violated with regard to its requirements of annual inspections of the ventilation system by qualified ventilation personnel.

4. The Court's order of March 25, 1976 has been violated with regard to the placement of individuals in disciplinary segregation on the first floor of the SHU without a timely IDC hearing.

5. Warden Fenton had or should have had knowledge of the above violations.

6. Warden Fenton's actions constitute civil contempt of this Court's order of March 25, 1976.